## No. 21-1491

In the United States Court of Appeals
for the Sixth Circuit

―――――――――

# United States of America,

Plaintiff-Appellee,

v.

# Abiodun Olufemi Fabode,

Defendant-Appellant.

―――――――――

On Appeal from the United States District Court
for the Eastern District of Michigan
No. 2:18-cr-20351-3 (Hon. Nancy G. Edmunds)

―――――――――

## Brief for the United States

―――――――――

Dawn N. Ison
United States Attorney

Jessica Currie
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9531
Jessica.Currie@usdoj.gov

# Table of Contents

Table of Authorities ........................................................................ iii

Oral Argument Is Unnecessary ................................................... vi

Issues Presented ............................................................................... 1

Statement of the Case ..................................................................... 3

A.    A prior investigation into Fabode's prescribing practices
      results in a consent decree. ................................................... 3

B.    Fabode conspires in an opioid diversion scheme by
      knowingly filling fraudulent prescriptions. ..................... 4

C.    Data review and expert analysis further expose the scheme. ........ 8

D.    Fabode is convicted on multiple counts and receives a
      below-guidelines sentence. ................................................. 10

Summary of the Argument ........................................................... 12

Argument .......................................................................................... 15

I.    The district court's drug-quantity determination was more
      conservative than it could have been and was not clearly
      erroneous. ............................................................................... 15

II.   The district court did not abuse its discretion in imposing a
      below-guidelines sentence. ................................................. 23

III.  The district court did not abuse its discretion in allowing
      evidence of the prior investigation to rebut Fabode's good-
      faith defense. .......................................................................... 26

IV.   The district court's decision to quash the subpoena of co-
      owner Bolanle was not an abuse of discretion. .............. 30

i

V.  There was no prosecutorial misconduct in closing
    argument, let alone flagrant misconduct constituting
    reversible plain error........................................................................33

    A.  The government did not improperly vouch for the
        credibility of its witnesses. ....................................................34

    B.  The prosecutor did not comment on facts not in
        evidence. ...............................................................................37

Conclusion.................................................................................................39

Certificate of Compliance with Rule 32(a) ............................................40

Certificate of Service ..............................................................................41

Relevant District Court Documents .......................................................42

# Table of Authorities

## Cases

*Davis v. Straub*, 430 F.3d 281 (6th Cir. 2005)..........................................32

*United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008) ......................16

*United States v. Benson*, 591 F.3d 491 (6th Cir. 2010) ...........................21

*United States v. Brown*, 147 F.3d 477 (6th Cir. 1998) ............................25

*United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994) ...........................36

*United States v. Castro*, 960 F.3d 857 (6th Cir. 2020) ............................21

*United States v. Charles*, 138 F.3d 257 (6th Cir. 1998) ..........................22

*United States v. Conatser,* 514 F.3d 508 (6th Cir. 2008) .................23, 24

*United States v. Crosgrove*, 637 F.3d 646 (6th Cir. 2011)......................37

*United States v. Derrick*, 519 F.2d 1 (6th Cir. 1975)...............................24

*United States v. Easley*, 306 F. App'x 993 (6th Cir. 2009)......................22

*United States v. Emuegbunam*, 268 F.3d 377 (6th Cir. 2001)...............37

*United States v. Francis,* 170 F.3d 546 (6th Cir. 1999) ....................34, 36

*United States v. Frost*, 914 F.2d 756 (6th Cir. 1990) ..............................25

*United States v. Gibbs*, 182 F.3d 408 (6th Cir. 1999) .............................30

*United States v. Greco*, 734 F.3d 441 (6th Cir. 2013)..............................23

*United States v. Hernandez*, 227 F.3d 686 (6th Cir. 2000).........15, 16, 21

*United States v. Highgate*, 521 F.3d 590 (6th Cir. 2008).................30, 31

*United States v. Jeross*, 521 F.3d 562 (6th Cir. 2008).............................15

**Cases**

*United States v. Johnson*, 24 F.4th 590 (6th Cir. 2022) ......................... 26

*United States v. Khodak*, Crim. No. 09-187, 2010 WL 1071420
 (E.D. Pa. Mar. 22, 2010) ................................................................. 16

*United States v. Lee*, 974 F.3d 670 (6th Cir. 2020) ................................ 23

*United States v. Medina*, 992 F.2d 573 (6th Cir. 1993) .......................... 31

*United States v. Mehmood*, 742 F. App'x 928 (6th Cir. 2018) ................. 16

*United States v. Owens*, 426 F.3d 800 (6th Cir. 2005) ........................... 34

*United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984) .......................... 33

*United States v. Rayyan*, 885 F.3d 436 (6th Cir. 2018) .......................... 24

*United States v. Reid*, 625 F.3d 977 (6th Cir. 2010) .............................. 36

*United States v. Smith-Kilpatrick*, 942 F.3d 734 (6th Cir. 2019) ........... 23

*United States v. Stapleton*, 297 F. App'x 413 (6th Cir. 2008) ........... 32, 33

*United States v. Stewart*, 628 F.3d 246 (6th Cir. 2010) ......................... 24

*United States v. Studabaker*, 578 F.3d 423 (6th Cir. 2009) ................... 15

*United States v. Talley,* 164 F.3d 989 (6th Cir. 1999) ............................ 33

*United States v. Trujillo*, 376 F.3d 593 (6th Cir. 2004) ......................... 34

*Williams v. United States,* 503 U.S. 193 (1992) ..................................... 22

**Statutes**

18 U.S.C. § 3553(a) ................................................................. 1, 13, 23

21 U.S.C. § 841(a)(1) ................................................................... 10

21 U.S.C. § 846 ............................................................................ 10

**Rules**

Fed. R. Crim. P. 35(b) ................................................................. 24

Fed. R. Evid. 403 ........................................................................ 27

Fed. R. Evid. 404(b) ....................................................... 13, 26, 28

**Guidelines**

USSG § 1B1.3(a)(1)(B) ................................................................. 16

USSG § 2D1.1(c) ............................................................ 15, 19, 20

USSG § 3E1.1 ............................................................................. 24

USSG § 5K1.1 ............................................................................. 24

## Oral Argument Is Unnecessary

Fabode's arguments are foreclosed by the evidentiary record, settled law, and the deferential standards of review. Oral argument is therefore unlikely to aid the Court in deciding this appeal.

# Issues Presented

I.     In calculating Fabode's sentencing guidelines, the district court took a conservative approach on drug quantity and held him responsible only for a limited subset of pills that he personally dispensed, even though he should have been accountable for all illegally dispensed prescriptions that were reasonably foreseeable to him. An even more conservative calculation yields the same base offense level. Was the district court's estimate clearly erroneous?

II.    The district court considered the relevant § 3553(a) factors and sentenced Fabode to 96 months in prison, a substantial downward variance. The district court deemed Fabode's sentence appropriate relative to the shorter sentences of his codefendants, who pleaded guilty and cooperated at his trial. Did the district court act within its discretion?

III.   A prior investigation into Fabode's prescribing practices resulted in a consent decree that required him to complete training on fraud and diversion. Did the district court act within its discretion in admitting certain aspects of the prior investigation as rebuttal to Fabode's good-faith defense and for impeachment?

IV.    Fabode sought to have his business partner, Olugbade Bolanle, testify at trial. Bolanle appeared in response to the subpoena with independent counsel, who explained that his client could not testify without incriminating himself or committing perjury. Did the district court act within its discretion in quashing the subpoena?

V.    During closing argument, after the defense mischaracterized the cooperation agreements of several witnesses, the prosecutor clarified that, under those agreements, any recommendation for a reduced sentence depended on the witnesses testifying truthfully. She also reminded the jury about the amount of Oxycodone that Fabode's pharmacy dispensed during the conspiracy and the resulting profit, again based on evidence introduced at trial. Did the prosecutor's unobjected-to statements, if improper at all, amount to such flagrant misconduct that Fabode can show reversible plain error?

# Statement of the Case

## A.    A prior investigation into Fabode's prescribing practices results in a consent decree.

In 2010, Abiodun Fabode opened Friendz Pharmacy in Detroit, Michigan with co-owner Olugbade Bolanle, another pharmacist. (R.195: Jury Trial (Fabode), 2083–85). In 2011, the state pharmacy board confronted Fabode about fraudulent prescriptions that Friendz Pharmacy had filled. (R.197: Jury Trial (Fabode), 2258–59). Fabode claimed that he had filled the prescriptions in good faith. (R.197: Jury Trial (Fabode), 2260, 2263). He resolved the litigation by consent decree, acknowledging that the circumstances should have caused him to look more closely at the validity of the prescriptions before dispensing the medication. (R.197: Jury Trial (Fabode), 2259). The stipulation read, in part, that Fabode had been "fooled by professional criminals who used sophisticated, organized methodology to deceive pharmacists in southeast Michigan." (R.197: Jury Trial (Fabode), 2261). Fabode's pharmacy license was put on probation for a year, he paid a $10,000 fine, and he completed continuing education on detecting fraud and diversion. (R.197: Jury Trial (Fabode), 2318–19).

3

**B.      Fabode conspires in an opioid diversion scheme by knowingly filling fraudulent prescriptions.**

A few years later, another investigation into Friendz Pharmacy uncovered the opioid diversion scheme here. (R.188: Jury Trial (Allan), 1085–1153). The scheme relied on "patient recruiters" who gathered fake patients, paid them $100, and procured opioid scripts in their names from doctors who were willing to write fraudulent prescriptions. (R.188: Jury Trial (Allan), 1102–1103; R.189: Jury Trial (N. Tibu), 1254; R.190: Jury Trial (N. Tibu), 1332). Andrei and Niesheia Tibu were among the patient recruiters. (R.189: Jury Trial (N. Tibu), 1254; R.192: Jury Trial (A. Tibu), 1701). Dr. Vasan Deshikachar was among the doctors who wrote the illegitimate scripts. (R.191: Jury Trial (Deshikachar), 1546–47; R.192: Jury Trial (A. Tibu), 1704–1706). And Friendz Pharmacy, along with Precare Pharmacy and Global Health Pharmacy, dispensed the pills, which the recruiters then sold on the streets. (R.189: Jury Trial (N. Tibu), 1283–85; R.192: Jury Trial (A. Tibu), 1721).

Niesheia filled illegitimate scripts at Friendz Pharmacy, whereas her husband Andrei used the other two pharmacies. (R.192: Jury Trial (A. Tibu), 1712). In the beginning, Niesheia recruited about 25 people

4

willing to pose as fake patients and relied on doctors from a chiropractic clinic to write the scripts. (R.189: Jury Trial (N. Tibu), 1258–59, 1289). Fabode and co-owner Bolanle rotated weeks, and Niesheia relied on both pharmacists to fill the scripts, but Niesheia dealt mostly with Fabode because he was willing to dispense more drugs. (R.189: Jury Trial (Allan), 1207; R.189: Jury Trial (N. Tibu), 1284, 1291; R.191: Jury Trial (N. Tibu), 1450, 1484–85, 1515–16).

Fabode charged Niesheia whatever he wanted. (R.189: Jury Trial (N. Tibu), 1303–1304). To fill an Oxycodone script, for example, he charged her $800 or more in cash, a considerable mark-up for a medication that ordinarily costs between $200 and $300. (R.190: Jury Trial (N. Tibu), 1332; R.190: Jury Trial (Catizone), 1387). Fabode told Niesheia that she could afford what he charged because he knew what the pills sold for on the street. (R.191: Jury Trial (N. Tibu), 1524–25).

About four or five months into the scheme, the doctors from the chiropractic clinic were indicted, so Niesheia needed another doctor. (R.189: Jury Trial (N. Tibu), 1260). She asked Fabode, who referred her to Dr. Deshikachar. (R.189: Jury Trial (N. Tibu), 1260; R.191: Jury Trial (Deshikachar), 1569). At the time, Dr. Deshikachar worked out of a

space inside Friendz Pharmacy. (R.189: Jury Trial (N. Tibu), 1263). He later moved to a space next door, but it was just a warehouse with a few chairs. (R.189: Jury Trial (N. Tibu), 1263, 1266). Eventually, Dr. Deshikachar stopped having an office altogether, but he continued to write scripts while living mostly in Boca Raton, Florida. (R.188: Jury Trial (Allan), 1095–96; R.189: Jury Trial (N. Tibu), 1276).

Over time, Niesheia's group of recruited patients grew to 80 people. (R.189: Jury Trial (N. Tibu), 1289). Each person met with Dr. Deshikachar for only 5 to 10 minutes. (R.189: Jury Trial (Allan), 1206; R.193: Jury Trial (Robinson), 1854–55; R.193: Jury Trial (L. Jones), 1796). None of them needed opioid medication for pain. (R.189: Jury Trial (N. Tibu), 1269). Dr. Deshikachar did not examine them or investigate whether they were legitimate patients. (R.191: Jury Trial (Deshikachar), 1547).

For the most part, these individuals reported similar experiences: for $100, they met briefly with a doctor, who prescribed them opioids they didn't need without examining them, and they never received the pills. (R.193: Jury Trial (K. Jones), 1781–85); R.193: Jury Trial (L. Jones), 1796–1806); R.193: Jury Trial (Jackson), 1827–31; R.193: Jury

6

Trial (Robinson), 1854–58). One individual told Dr. Deshikachar that she wasn't in any pain, but he wrote the script anyway. (R.193: Jury Trial (L. Jones), 1821–22). There was no need to lie, she said, because the doctor knew it was a scam. (R.193: Jury Trial (L. Jones), 1822–23).

Niesheia also paid these individuals to accompany her to Friendz Pharmacy to have the prescriptions filled. (R.193: Jury Trial (Duval), 1771–74; R.193: Jury Trial (Jackson), 1828; R.193: Jury Trial (Booker), 1848–49). One individual reported arriving in a van with six other fake patients. (R.193: Jury (Jackson), 1830). Another saw Niesheia argue with the pharmacist over the cost of the pills. (R.193: Jury Trial (Robinson), 1858).

Niesheia paid Dr. Deshikachar up to $450 for each illegitimate script. (R.189: Jury Trial (N. Tibu), 1269; R.191: Jury Trial (Deshikachar), 1552). According to Dr. Deshikachar, the scam was obvious, and would be obvious to any medical professional, because the fake patients were mostly ambulatory and all the prescriptions were basically the same. (R.191: Jury Trial (Deshikachar), 1566–67). Every script he wrote during the conspiracy period was illegitimate, every person that Fabode referred to him was a patient recruiter like

Niesheia, and Fabode did not call Dr. Deshikachar to verify the prescriptions. (R.191: Jury Trial (Deshikachar), 1580–82; R.192: Jury Trial (Deshikachar), 1640).

Fabode also asked Dr. Deshikachar to take steps to mask the illegality, such as prescribing maintenance medication along with the opioids. (R.191: Jury Trial (Deshikachar), 1568). And Bolanle told Dr. Deshikachar not to have so many people congregated in the pharmacy lobby waiting to see him because "it doesn't look nice" and made Bolanle uncomfortable. (R.191: Jury Trial (Deshikachar), 1556). Eventually, Dr. Deshikachar wrote the scripts without seeing the fake patients. (R.191: Jury Trial (Deshikachar), 1556–57). He sometimes saw the patient recruiters take the prescriptions directly to Fabode or Bolanle to be filled immediately. (R.191: Jury Trial (Deshikachar), 1556). As Dr. Deshikachar put it, he was running a pill mill, nothing more. (R.191: Jury Trial (Deshikachar) 1581–82).

## C.    Data review and expert analysis further expose the scheme.

As part of the investigation, agents reviewed data from the Michigan Automated Prescription System (MAPS), which maintains records of filled prescriptions for controlled substances. (R.188: Jury

8

Trial (Allan), 1090–91). They also analyzed thousands of prescription forms recovered from Friendz Pharmacy, many written by Dr. Deshikachar for commonly diverted opioids. (R.188: Jury Trial (Allan), 1038–42). In comparing the prescription forms to the MAPS data, agents found evidence of date conflicts, data manipulation, pattern prescribing, and slotting. (R.188: Jury Trial (Allan), 1144–48).

Pattern prescribing occurs when a doctor writes multiple scripts for the same medication, strength, and quantity to different people, which is a red flag for diversion. (R.190: Jury Trial (Catizone), 1395; R.188: Jury Trial (Allan), 1148–49). Slotting, another red flag, occurs when a pharmacist delays filling prescriptions to control the number of opioids being dispensed at any given time. (R.190: Jury Trial (Catizone), 1385; R.188: Jury Trial (Allan), 1147–48).

An expert in pharmacy practice and regulation, Carmen Catizone, likewise found multiple red flags in his review of the case materials. (R.190: Jury Trial (Catizone), 1349–50, 1360–90). In addition to pattern prescribing and slotting, he found the unusually high prices and predominantly cash payments significant. (R.190: Jury Trial (Catizone), 1383–87, 1430–31). He also reviewed text messages between Fabode

and Niesheia that included patient names and dates of birth, which are protected by privacy laws. (R.190: Jury Trial (Catizone), 1387). This and other information led Catizone to conclude that the activities at Friendz Pharmacy during the conspiracy period were outside the usual and customary practice of a pharmacy. (R.190: Jury Trial (Catizone), 1391).

## D. Fabode is convicted on multiple counts and receives a below-guidelines sentence.

After two weeks of trial, the jury found Fabode guilty of conspiracy to possess with intent to distribute Schedule II controlled substances under 21 U.S.C. § 846 and four counts of unlawful distribution of Oxycodone under 21 U.S.C. § 841(a)(1). (R.152: Verdict Form, 833–36). He was acquitted of the two remaining counts of unlawful distribution. (R.152: Verdict Form, 833–36).

At sentencing, the central dispute pertained to drug quantity. (R.246: Sentencing, 2786). The government argued that Fabode should be held responsible for all illegitimate Schedule II prescriptions filled by Friendz Pharmacy during the conspiracy period, regardless of whether Fabode or Bolanle dispensed the drugs. (R.238: Gov't Sentencing Memo, 2641). To be conservative, the government counted only Oxycodone 30 mg pills and Oxymorphone 40 mg pills, the most highly diverted

10

opioids. (R.238: Gov't Sentencing Memo, 2642). That subset amounted to 49,225 kg of converted drug weight, within the range for base offense level 36. (R.238: Gov't Sentencing Memo, 2642). Fabode argued that he should be held responsible only for the opioids prescribed by Dr. Deshikachar that Fabode personally dispensed. (PSR Addendum, A-5). That narrower subset amounted to 3,780 kg of converted drug weight, within the range for base offense level 32. (PSR Addendum, A-5).

In the end, the district court held Fabode responsible only for the opioids that he dispensed, but it did not limit the scope to Dr. Deshikachar's prescriptions. (R.246: Sentencing, 2787). The district court estimated that the updated subset of drugs fell within the quantity range for base offense level 34 (between 10,000 kg and 30,000 kg of converted drug weight). (R.246: Sentencing, 2791). The resulting guideline range was 188 to 235 months in prison. (R.246: Sentencing, 2789). The district court then varied downward and sentenced Fabode to 96 months in prison. (R.246: Sentencing, 2797–98).

Fabode timely appealed. (R.243: Notice of Appeal, 2780).

11

## Summary of the Argument

Fabode is serving a 96-month sentence for his role in an elaborate drug-diversion scheme that spanned several years in which he abused his position of trust as a pharmacist. His convictions and sentence should be affirmed.

With respect to the drug quantity used at sentencing, the district court counted only the most highly diverted opioids (Oxycodone 30 mg and Oxymorphone 40 mg) that Fabode personally dispensed during the conspiracy. That subset fell within the quantity range for base offense level 34. A more conservative approach—counting only the Oxycodone 30 mg and Oxymorphone 40 mg pills prescribed by the doctors identified at trial as being part of the scheme—yields the same base offense level. Accordingly, the district court's finding was supported by the evidence and by no means clearly erroneous.

Fabode's codefendants received shorter sentences because they accepted responsibility and provided substantial assistance through their testimony, which helped secure Fabode's convictions. That disparity is permissible, not unwarranted, and the district court was mindful to consider this factor before imposing sentence. Indeed, the

district court varied downward by almost fifty percent. The district court did not penalize Fabode for going to trial. The district court also did not run afoul of 18 U.S.C. § 3553(a)(6), which concerns *national* disparities within a class of similarly situated defendants, rather than differences between codefendants in a particular case.

The district court did not abuse its discretion in admitting certain aspects of the prior investigation. Fabode's defense at trial was that he filled prescriptions in good faith, allegedly oblivious to their invalidity, just as he had claimed in the prior investigation. The prior investigation was therefore relevant to show knowledge and absence of mistake, as permitted by Rule 404(b), and for impeachment purposes. The probative value of the evidence was not outweighed by the danger of unfair prejudice, especially since the jury received appropriate instructions.

Nor did the district court abuse its discretion in quashing Bolanle's subpoena. Bolanle reasonably feared prosecution, and requiring him to take the stand, only to repeatedly invoke the Fifth Amendment, would have been futile. The government did not intimidate Bolanle against testifying and, indeed, took no position one way or the other, so long as he consulted with counsel. As for the

13

suggestion to order immunity, the district court properly rejected the idea as outside its authority. Any error was harmless anyway given the overwhelming evidence of Fabode's guilt.

Finally, Fabode cannot show plain error in the prosecutor's closing argument. After defense counsel attacked the credibility of the cooperators and misrepresented the contents of their cooperation agreements, the prosecutor responded by reiterating what the cooperators said on the stand about those agreements—that they knew they would only receive a recommendation for a reduced sentence if they told the truth, and they were prepared to testify truthfully. The prosecutor did not express a personal belief in their credibility or rely on the prestige of her office, so there was no vouching. Her comments about the scheme's profitability and the quantity of drugs involved were likewise supported by the evidence, including expert testimony. And Fabode never objected to any of this. Because there was no misconduct, let alone flagrant misconduct or reversible plain error, Fabode is not entitled to a new trial.

# Argument

## I.     The district court's drug-quantity determination was more conservative than it could have been and was not clearly erroneous.

This Court reviews the procedural reasonableness of a sentence, including whether the district court properly calculated the guidelines, for abuse of discretion. *United States v. Studabaker*, 578 F.3d 423, 431 (6th Cir. 2009). In an opioid-diversion case, the district court must determine the drug quantity for which the defendant is responsible to ascertain his base offense level. USSG § 2D1.1(c). The district court's drug-quantity determination is a factual finding, reviewed for clear error. *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008).

When the exact quantity of drugs is unknown, a conservative estimate is permitted. *United States v. Hernandez*, 227 F.3d 686, 699 (6th Cir. 2000) ("Approximations are completely appropriate."). "[A] district court's approximation of drug quantity is not clearly erroneous if it is supported by competent evidence in the record." *Jeross*, 521 F.3d at 570. The district court may consider testimonial evidence, including the accounts of co-conspirators, so long as it errs on the side of caution and likely underestimates the quantity of drugs attributable to the

defendant. *Hernandez*, 227 F.3d at 699; *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008).

A district court is authorized to consider, as relevant conduct, the "reasonably foreseeable" acts and omissions of others that occur during "jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B). Accordingly, a district court may hold a pharmacist responsible for drugs unlawfully dispensed by other pharmacists if, under the circumstances, the acts were reasonably foreseeable to the defendant. *United States v. Mehmood*, 742 F. App'x 928, 946 (6th Cir. 2018) (instructing the district court on remand to apply § 1B1.3(a)(1)(B) to determine attribution of jointly undertaken criminal activity in healthcare fraud case); *see also United States v. Khodak*, Crim. No. 09-187, 2010 WL 1071420, at *4 (E.D. Pa. Mar. 22, 2010) (holding pharmacist-in-chief responsible for fraudulent scripts filled by co-workers).

Here, the conspiracy spanned years and included a network of pharmacies, patient recruiters, and doctors. Fabode referred several patient recruiters to Dr. Deshikachar, not just Niesheia and Andrei Tibu. (R.191: Jury Trial (Deshikachar), 1550–52 (discussing a patient

16

recruiter named "Jamea"); R.192: Jury Trial (Deshikachar), 1643
(Fabode referred "three to four" patient recruiters to Dr. Deshikachar)).
Likewise, Dr. Deshikachar was just one of many doctors who wrote the
fraudulent scripts. (R.189: Jury Trial (N. Tibu), 1259). Indeed, Niesheia
didn't begin relying on Dr. Deshikachar until several months into the
conspiracy. (R.189: Jury Trial (N. Tibu), 1259–60). And when Dr.
Deshikachar stopped writing scripts, Fabode suggested two other
doctors that she could use to continue getting scripts: Dr. Kirkpatrick
and Dr. Carter. (R.190: Jury Trial (N. Tibu), 1327–29).

The use of doctors other than Dr. Deshikachar was confirmed by
MAPS data introduced at trial, which showed that Friendz Pharmacy
filled illegitimate scripts for Niesheia and several fake patients that
were written by six different doctors: Carter, Deshikachar, Godoy,
Goldfine, Obayan, and Zhong. (R. 286: Notice of Filing Exhibits, Trial
Exs. 55–61, 3153–62). Witness testimony also identified these six
doctors as being used to carry out the fraud. (R.189: Jury Trial (Allan),
1244 (Dr. Godoy and Dr. Goldfine); R.189: Jury Trial (N. Tibu), 1259
(Dr. Zhong, Dr. Goldfine, and Dr. Godoy); R.191: Jury Trial (N. Tibu),

1497–98 (Dr. Carter); R.192: Jury Trial (A. Tibu), 1704–1705 (Dr. Godoy and Dr. Zhong)).

Fabode also knew that co-owner Bolanle would fill many of the scripts. Fabode testified that Friendz Pharmacy filled prescriptions in chronological order, without favoritism, and he did not set aside any to fill himself. (R.196: Jury Trial (Fabode), 2151–52). This, of course, made it foreseeable that illegitimate scripts would be filled by Bolanle, with whom Fabode alternated work weeks. (R.189: Jury Trial (Allan), 1207; R.189: Jury Trial (N. Tibu), 1296–97; R.195: Jury Trial (Fabode), 2083–84). Moreover, Niesheia and Dr. Deshikachar testified that *both* Fabode and Bolanle dispensed the medically unnecessary pills. (R.189: Jury Trial (N. Tibu), 1290; R.191: Jury Trial (Dr. Deshikachar), 1339). And in a wiretap call following her arrest, Niesheia contacted Enitan Sodiya-Ogundipe, the owner of the other pharmacies, and asked her to warn Fabode and Bolanle. (R.190: Jury Trial (N. Tibu), 1338–39). Niesheia wanted *both* pharmacists warned so that neither would fill her prescriptions going forward. (R.190: Jury Trial (N. Tibu), 1339). This was more than enough to hold Fabode accountable for drugs dispensed by Bolanle under the preponderance-of-the-evidence standard.

The total amount of Schedule II controlled substances dispensed by Fabode and Bolanle at Friendz Pharmacy during the conspiracy period was 363,368 pills. (Trial Ex. 62, 3163). To conservatively estimate the quantity that was unlawfully dispensed, the government counted only Oxycodone 30 mg pills and Oxymorphone 40 mg pills, the most highly diverted opioids. (R.238: Gov't Sentencing Memo, 2641–42). That subset included 209,310 Oxycodone 30 mg pills and 35,770 Oxymorphone 40 mg pills, totaling 49,225 kg of converted drug weight, which is within the range for base offense level 36. (PSR ¶¶ 20–21); USSG § 2D1.1(c)(2).

The district court, exercising more caution, held Fabode accountable only for the prescriptions he personally filled, "even though it would have been possible or even likely that he would have known what the other pharmacists were doing." (R.246: Sentencing, 2787). This yielded a base offense level of 34. (R.246: Sentencing, 2791). Fabode was not assessed a base offense level of 36, as he now claims. (Appellant Br. at 18–19).

The district court did not provide a precise calculation after limiting the government's estimate, but the most logical way to approximate the quantity dispensed by Fabode alone was to reduce 49,225 kg of converted drug weight by half, since Fabode and Bolanle rotated weeks. An even split was conservative given Niesheia's testimony that Fabode would dispense more drugs than Bolanle. (R.189: Jury Trial (N. Tibu), 1284; R.191: Jury Trial (N. Tibu), 1484–85). The halved amount was 24,613.5 kg of converted drug weight, which corresponded to base offense level 34. *See* USSG § 2D1.1(c)(3).

This calculation did not depend on mere conjecture. (Appellant Br. at 20). The evidence showed that a pill mill was being operated inside Friendz Pharmacy, that the conspiracy consisted of many pharmacists, doctors, and patient recruiters, and that Friendz Pharmacy was dispensing an extraordinary number of opioids. There was even testimony that Fabode refused to fill legitimate prescriptions. (R.193: Jury Trial (K. Jones), 1785–86).

The jury verdict did not constrain what the district court could consider, as Fabode suggests. (Appellant Br. at 25). "[A] sentencing

20

judge may find (by a preponderance of the evidence) that a defendant is responsible for a greater quantity of drugs than determined by the jury (applying the higher beyond-a-reasonable-doubt-standard)." *United States v. Castro*, 960 F.3d 857, 868 (6th Cir. 2020); *see also United States v. Benson*, 591 F.3d 491, 502–503 (6th Cir. 2010).

It was therefore appropriate, and not clear error, to conservatively hold Fabode accountable for half of the two most highly diverted opioids that his pharmacy dispensed during the conspiracy. *Hernandez*, 227 F.3d at 699 (finding the drug-quantity determination "supportable and probably conservative" and noting "it could have chosen an amount substantially larger"). No abuse of discretion occurred.

Even if the district court had taken a more conservative approach, Fabode's base offense level would have remained at 34, which required only 10,000 kg of converted drug weight. For instance, if the district court had counted only the Oxycodone and Oxymorphone (with brand name Opana) in strengths of 30 mg and 40 mg, respectively, prescribed only by the doctors specifically identified at trial as being involved in

the conspiracy, Friendz Pharmacy distributed 54,824 Oxycodone 30 mg

pills and 3,000 Oxymorphone 40 mg pills:

| Doctor | Oxycodone 30mg | Oxymorphone 40mg |
|---|---|---|
| Carter | 3,780 pills | 360 pills |
| Deshikachar | 30,623 pills | 780 pills |
| Godoy | 2,001 pills | 0 pills |
| Goldfine | 3,090 pills | 0 pills |
| Kirkpatrick | 2,250 pills | 120 pills |
| Obayan | 11,970 pills | 1,740 pills |
| Zhong | 4,200 pills | 0 pills |
| Total | **54,824 pills** | **3,000 pills** |

(Trial Ex. 54: MAPS Data (exhibit filed with the Sixth Circuit clerk's

office)). Those Oxycodone pills equate to 11,019.6 kg of converted drug

weight, and those Oxymorphone pills equate to 600 kg of converted

drug weight—for a total converted drug weight of 11,619.6 kg.

Thus, even using a more conservative methodology, Fabode's drug

quantity was well within the range for base offense level 34. So any

flaws in the district court's methodology would not justify reversal,

because Fabode's base offense level and guideline range would be the

same either way. *United States v. Easley*, 306 F. App'x 993, 997 (6th

Cir. 2009) (citing *United States v. Charles*, 138 F.3d 257, 268 (6th Cir.

1998)); *see Williams v. United States,* 503 U.S. 193, 203 (1992).

22

II.    **The district court did not abuse its discretion in imposing a below-guidelines sentence.**

This Court reviews the substantive reasonableness of a sentence for abuse of discretion. *United States v. Lee*, 974 F.3d 670, 676 (6th Cir. 2020). "A sentence may be considered substantively unreasonable when the district court selects a sentence arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *United States v. Conatser,* 514 F.3d 508, 520 (6th Cir. 2008). When a defendant challenges a below- or within-guideline sentence on appeal, as here, that sentence is presumed reasonable. *United States v. Smith-Kilpatrick*, 942 F.3d 734, 747 (6th Cir. 2019). "Although it is not impossible to succeed on a substantive-reasonableness challenge to a below-guidelines sentence, defendants who seek to do so bear a heavy burden." *United States v. Greco*, 734 F.3d 441, 450 (6th Cir. 2013).

Fabode argues that the disparity between his sentence and those imposed against his codefendants violated § 3553(a)(6) and penalized him for exercising his constitutional right to proceed to trial. (Appellate Br. at 26–27). This claim is meritless. For starters, Fabode has misread § 3553(a)(6). That section "concerns *national* disparities within a class

23

of similar defendants, not disparities between one defendant and another." *United States v. Rayyan*, 885 F.3d 436, 442 (6th Cir. 2018) (emphasis added).

In addition, Fabode was not similarly situated with his codefendants. Beyond accepting responsibility for their actions, Fabode's codefendants cooperated with the government by providing testimony that proved critical in securing Fabode's convictions. It is expected that those who plead guilty and provide substantial assistance receive shorter sentences. *See United States v. Stewart*, 628 F.3d 246, 260 (6th Cir. 2010); *Conatser*, 514 F.3d at 522; *see also* USSG §§ 3E1.1, § 5K1.1; Fed. R. Crim. P. 35(b). The district court was also cognizant of the need to avoid unwarranted disparities between Fabode and his codefendants: "[I]t's important to keep some sort of relativity with respect to [the codefendant] sentences." (R.246: Sentencing, 2797).

This case is distinguishable from *United States v. Derrick*, 519 F.2d 1 (6th Cir. 1975). There, the district court felt compelled to impose a harsher sentence because it conducted "two long trials and goodness knows how much money the government has spent." *Id.* at 2. Here, by contrast, there is no indication that the district court considered

24

Fabode's decision to go to trial in imposing sentence. *See United States v. Brown*, 147 F.3d 477, 488 (6th Cir. 1998) ("With respect to Brown's claim that his sentence was enhanced because he chose to go to trial, there is simply no evidence in the record to support that claim."). "Mere disparity in sentences is insufficient to show that the sentencing court penalized [a defendant] for going to trial." *United States v. Frost*, 914 F.2d 756, 774 (6th Cir. 1990).

Far from penalizing Fabode, the district court gave him every benefit of the doubt. It did not hold him accountable for illegitimate scripts filled by Bolanle or impose a leadership enhancement, although it recognized it could have. (R.246: Sentencing, 2787–89). It did not impose an enhancement for obstruction of justice, despite all indications that Fabode perjured himself at trial. (R.246: Sentencing, 2789). And it lowered his criminal history category. (R.246: Sentencing, 2788–89). This leniency resulted in a guideline range of 188 to 235 months, significantly lower than the probation department's calculated range of life imprisonment, which had been restricted only by the 20-year statutory maximum for each count. (PSR ¶ 60). The district court

stated, "I think that's about as lenient as I can be," to which defense counsel replied, "Absolutely." (R.246: Sentencing, 2790).

Over the government's objection, the district court also gave Fabode a substantial downward variance. Its decision to impose a 96-month sentence, nearly a fifty-percent reduction, is even more remarkable given Fabode's continued lack of remorse following his conviction. He stated, "I regret that the medications intended to help people with pain ended up in the wrong hands," but expressed no personal accountability. (R.246: Sentencing, 2794). For all these reasons, Fabode's sentence should be affirmed.

## III.   The district court did not abuse its discretion in allowing evidence of the prior investigation to rebut Fabode's good-faith defense.

This Court "review[s] evidentiary issues for abuse of discretion, while acknowledging that there is an on-going dispute in this circuit concerning the proper standard of review of Rule 404(b) evidence." *United States v. Johnson*, 24 F.4th 590, 605 (6th Cir. 2022) (internal quotation marks omitted). Evidence of prior bad acts are not admissible to prove character, but may be admissible for other purposes, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). To be

26

admissible, the probative value of the evidence must not be outweighed by the danger of unfair prejudice. Fed. R. Evid. 403.

Here, with respect to the 2011 investigation, the district court ruled that the underlying facts were too prejudicial. But it permitted the government to introduce evidence that Fabode's prescribing habits were investigated, he was confronted about suspected diversion, and the resulting consent decree required him to complete certain training. (R.285: Motion Hearing, 3142–43). This was admissible, the court held, to show knowledge and absence of mistake, particularly given Fabode's anticipated good-faith defense. (R.285: Motion Hearing, 3140).

At trial, Fabode testified that he was concerned about diversion and allegedly followed a protocol to verify whether prescriptions were legitimate. (R.196: Jury Trial (Fabode), 2149–52). He also claimed to be unaware that Dr. Deshikachar's scripts were fraudulent or that Niesheia was a pill dealer, maintaining that he acted in good faith. (R.196: Jury Trial (Fabode), 2156–61, 2238).

When the government brought up the prior investigation in response to those claims, defense counsel objected. (R.196: Jury Trial, 2238–39). The district court overruled the objection because Fabode had

just testified in support of a good-faith defense. (R.197: Jury Trial, 2246–47). The prior investigation, in which Fabode raised the same defense, was thus admissible under Rule 404(b) and to impeach him. (R.197: Jury Trial, 2246–47). The court gave a limiting instruction and allowed the government to continue. (R.197: Jury Trial, 2256–57).

Thereafter, Fabode acknowledged the consent decree, under which he stipulated to filling fraudulent prescriptions under circumstances that should have caused him to look more closely at their validity. (R.197: Jury Trial (Fabode), 2258–59). The stipulation read, in part, that he was "fooled by professional criminals." (R.197: Jury Trial (Fabode), 2261). Fabode also testified that he completed training on fraud and diversion, as required by the consent decree. (R.197: Jury Trial (Fabode), 2262).

Contrary to Fabode's suggestion, the government did not bring up the underlying facts of the prior investigation, accuse Fabode of lying in the earlier proceeding, or suggest that he knowingly diverted drugs back then. (Appellant Br. at 31–33). Instead, the government focused on the consent decree, under which Fabode stipulated that he was tricked in the past and had to complete training on fraud and diversion. This, of

course, was relevant to rebut his claimed obliviousness and to attack the credibility of his good-faith defense. The evidence was highly probative for those purposes and not outweighed by the danger of unfair prejudice, particularly given proper instructions, both contemporaneously with the evidence and before deliberations began. (R.197: Jury Trial, 2257; R.199: Jury Instructions, 2384). No abuse of discretion occurred.

Moreover, the jury had every reason to discredit Fabode's defense, even apart from the prior investigation. Dr. Deshikachar testified that the fraud was so obvious that no medical professional would be fooled. (R.191: Jury Trial (Deshikachar), 1566–67). And Fabode did not called Dr. Deshikachar to verify the prescriptions he wrote. (R.191: Jury Trial (Deshikachar), 1580). Neisheia testified that Fabode knew the scripts were illegitimate and even used the street value of the drugs to demand exorbitant prices. (R.191: Jury Trial (N. Tibu), 1450, 1524–25). The record also showed his efforts to cover up the illegality, for example, through slotting, maintenance medication, and data manipulation. Any error in allowing the government to introduce limited evidence of the prior investigation was therefore harmless.

IV.    **The district court's decision to quash the subpoena of co-owner Bolanle was not an abuse of discretion.**

At trial, Fabode sought to call co-owner Bolanle as a witness. (R.193: Jury Trial, 1728–29). Although Bolanle appeared in response to the subpoena, his appointed counsel explained that he could not testify without making criminal admissions or committing perjury. (R.194: Jury Trial, 2004–2005). After hearing oral argument, the district court quashed the subpoena. (R.194: Jury Trial, 2015). That decision is reviewed for abuse of discretion. *United States v. Gibbs*, 182 F.3d 408, 431 (6th Cir. 1999).

"A defendant's right to compel testimony yields to a witness's assertion of his or her Fifth Amendment privilege when the claimed privilege is grounded on a reasonable fear of prosecution." *United States v. Highgate*, 521 F.3d 590, 593–94 (6th Cir. 2008). Although a court errs if it accepts a blanket assertion of privilege, "in certain circumstances, when it is clear that the witness intends to invoke the privilege with respect to any question asked, a particularized inquiry by the court would be futile." *Gibbs*, 182 F.3d at 431 (cleaned up). Futility may be found, for example, where a witness, after consultation with counsel, is

30

adamant on his decision to invoke the privilege in response to any questions. *United States v. Medina*, 992 F.2d 573, 586 (6th Cir. 1993).

Here, Bolanle had a reasonable fear of prosecution, and making him take the stand would have been futile. As Bolanle's counsel stated: "After extensive meetings between myself and my client, . . . there's no avenue of examination that I believe would be even remotely open for my client to answer questions." (R.194: Jury Trial, 2005). Bolanle's counsel also explained that, based on his review of case materials, defense counsel was mistaken in believing that Bolanle would provide exculpatory testimony. (R.194: Jury Trial, 2012–13).

Bolanle's testimony stood no real chance of changing the jury's verdict anyway. According to his own counsel, any truthful testimony would have been incriminating. As for any protocols, his testimony, at best, would have been cumulative of Fabode's testimony, which offered little probative value to begin with. Having protocols does not ensure their compliance, and the evidence of Fabode's guilt was overwhelming. Any error in quashing the subpoena was therefore harmless. *Highgate*, 521 F.3d at 595.

31

Fabode also claims that the government intimidated Bolanle against testifying, in violation of his right to due process. (Appellant Br. at 51). To establish such a violation, Fabode must show "substantial interference with a witness's free and unhampered determination to testify," and the showing is "subject to harmless-error analysis." *United States v. Stapleton*, 297 F. App'x 413, 430 (6th Cir. 2008).

No interference occurred here, let alone substantial interference. In fact, the government expressed its indifference about whether Bolanle testified, so long as he first consulted with counsel. (R.193: Jury Trial, 1733–34; R.194: Jury Trial, 1904, 2006). The government notified the district court of Bolanle's exposure only to facilitate the appointment of independent counsel. (R.193: Jury Trial, 1733–34; R.194: Jury Trial, 1904); *see also Davis v. Straub*, 430 F.3d 281, 287 (6th Cir. 2005) (discussing ethical obligations under ABA model rules).

In *Stapleton*, this Court found no violation under similar circumstances. There, the defendant sought to call a suspected co-conspirator as a witness. *Stapleton*, 297 F. App'x at 430. After obtaining dismissal without prejudice against the witness, the government stated that it might re-indict the witness based on his testimony. *Id*. The

32

witness thereafter invoked the Fifth Amendment. *Id*. No impropriety occurred because the decision whether to re-indict the witness if his testimony provided new evidence would be within the government's discretion, and no evidence suggested that the government took any steps to discourage his testimony. *Id*. at 431.

Fabode's arguments regarding immunity also fail. (Appellant Br. at 53). Whether to grant witness immunity is a matter of prosecutorial discretion. *Stapleton*, 297 F. App'x at 432; *see also United States v. Talley,* 164 F.3d 989, 997 (6th Cir. 1999); *United States v. Pennell*, 737 F.2d 521, 528 (6th Cir. 1984) ("The choice of whom to prosecute rests, of course, with the government and not with the courts."). In any event, the record demonstrates that Fabode would have been unable to succeed on his good-faith defense even with the desired testimony, so any error was harmless. *See Stapleton*, 297 F. App'x at 432.

## V.   There was no prosecutorial misconduct in closing argument, let alone flagrant misconduct constituting reversible plain error.

Fabode argues that the government committed misconduct during closing argument, in two respects: by improperly vouching for witnesses and by commenting on facts not in evidence. Because defense counsel did not object, Fabode must show that the alleged misconduct "was so

especially flagrant that it constitutes plain error." *United States v. Owens*, 426 F.3d 800, 806–807 (6th Cir. 2005) (internal quotation marks omitted). Fabode falls short of his burden on both claims.

### A.    The government did not improperly vouch for the credibility of its witnesses.

Improper vouching occurs when a prosecutor asserts a personal belief in a witness's credibility or backs the claim by implying personal knowledge of facts unknown to the jury. *United States v. Francis,* 170 F.3d 546, 550 (6th Cir. 1999). A prosecutor does not run afoul of this rule by referring to a plea agreement and its terms, including an obligation to testify truthfully. *United States v. Trujillo*, 376 F.3d 593, 609 (6th Cir. 2004). A prosecutor may also rebut *attacks* on credibility for having signed the agreement. *Owens*, 426 F.3d at 806; *Francis,* 170 F.3d at 550.

Here, defense counsel attacked the credibility of the cooperators by asserting, with respect to their cooperation agreements, that they were told that the government would only "write a memorandum to the judge" for a sentence reduction if they provided testimony "helpful to [the government]." (R.199: Jury Trial, 2425–26). Defense counsel asked the jury to consider, "who has a reason to lie or not be totally candid?"

34

(R.199: Jury Trial, 2426). This argument mischaracterized the agreements, which required the cooperators to provide only truthful testimony, not whatever testimony might be helpful to the government. (*See, e.g.*, R.189: Jury Trial (N. Tibu), 1257–58).

In rebuttal, the prosecutor responded to defense counsel's accusations by noting that the cooperators had all testified that they were there to tell the truth and understood that their cooperation agreements required only truthful testimony:

> All of them testified that [the] recommendation does not come [in] unless their testimony is truthful. And they were here to speak their truth, which is what they did. They've all accepted responsibility for their actions, and they were here to tell you about the truthful testimony they've given as to what their roles were in this conspiracy.

(R.199: Jury Trial, 2457). This was not the prosecutor's personal belief; it was what the cooperators said on the stand—that they understood the terms of their agreements and that they were prepared to tell the truth. (R.192: Jury Trial (A. Tibu), 1703–1704; R.189: Jury Trial (N. Tibu), 1257–58 (testifying that no one had told her what to say and she was prepared to tell the truth); R.191: Jury Trial (Deshikachar), 1536 (same), 1536–37); R.192: Jury Trial (E. Sodiya-Ogundipe), 1658 ("If I don't tell the truth, that means I violated everything I signed. . . . I'm

35

prepared to be fully truthful."); (R.193: Jury Trial (A. Tibu), 1764 ("I came here to tell the truth and what I did.")).

By contrast, in *United States v. Carroll*, 26 F.3d 1380 (6th Cir. 1994), the prosecutor stated that the cooperators would stay in jail longer if the government found out they lied and "no person would jeopardize themselves with this agreement" by lying. *Id*. at 1383 & nn. 1–2. This was vouching because "the prosecutor blatantly implied that the . . . plea agreements ensured that the witnesses were truthful" and "placed the prestige of the government, and even of the court, behind [their] credibility." *Id*. at 1389. But here, the prosecutor merely reiterated that a recommendation was conditioned on truthful testimony and that the witnesses all stated they were there to tell the truth. *See United States v. Reid*, 625 F.3d 977, 984 (6th Cir. 2010) (finding similar comments proper and distinguishing *Carroll*).

Accordingly, the prosecutor did not engage in misconduct, let alone flagrant misconduct. Her isolated comments were designed to rebut defense counsel's attacks on credibility, not to mislead the jury, and the evidence of Fabode's guilt was overwhelming. *See Francis,* 170 F.3d at 549–50.

### B.    The prosecutor did not comment on facts not in evidence.

A prosecutor may not make statements in closing argument that "bring to the attention of the jury facts not in evidence." *United States v. Emuegbunam*, 268 F.3d 377, 404 (6th Cir. 2001). But it is permissible to argue reasonable inferences from the evidence. *United States v. Crosgrove*, 637 F.3d 646, 664 (6th Cir. 2011). And instructing the jury that the lawyers' arguments are not evidence will "generally cure any improprieties." *Emuegbunam*, 268 F.3d at 406; *see also Crosgrove*, 637 F.3d at 664 (finding no prosecutorial misconduct where jury instruction would likely have corrected any impropriety).

Fabode takes issue with the prosecutor's statement that he trafficked more than 200,000 doses of medication and profited over a million dollars during the conspiracy. (Appellant Br. at 46; *see* R.199: Jury Trial, 2420). But the opinion testimony of James Hicks, along with underlying data, fully supported the statement: "Using the price of $800 per prescription and the MAPS data that showed 2,369 prescriptions [of Oxycodone 30 milligrams] were filled, we came up with a total [gross proceeds] of $1.8 million, approximately." (R.193: Jury Trial (Hicks), 1884); *see also* R. 286: Trial Ex. 63, 3164 (totaling 214,290 doses of

37

Oxycodone dispensed during the conspiracy period, including 2,369 prescriptions of Oxycodone 30 mg); R.190: Jury Trial (N. Tibu), 1332 (testifying that Fabode charged $800)).

These figures were conservative. The record demonstrated a long-standing opioid diversion scheme supported by a network of drug dealers and medical professionals and involving multiple Schedule II substances, not just Oxycodone. Thus, the prosecutor's interpretation of the evidence, if it was error, was not flagrantly improper, especially given the strength of the evidence against Fabode. And any impropriety was cured by the district court's instructions that the jury did not have to accept Hicks's opinions and that statements and arguments by lawyers are not evidence. (R.199: Jury Trial, 2368, 2381). Fabode is not entitled to a new trial.

# Conclusion

This Court should affirm Fabode's convictions and sentence.

Respectfully submitted,

Dawn N. Ison
United States Attorney


/s/ *Jessica Currie*
Jessica Currie
Assistant United States Attorney
Eastern District of Michigan
211 West Fort Street, Suite 2001
Detroit, MI 48226
(313) 226-9531
Jessica.Currie@usdoj.gov

Dated: April 8, 2022

## Certificate of Compliance with Rule 32(a)

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the brief exempted by Rule 32(f), it contains 7,142 words. This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook.

/s/ Jessica Currie
Assistant United States Attorney

Dated: April 8, 2022

# Certificate of Service

I certify that on April 8, 2022, I caused this Brief for the United States to be electronically filed with the Clerk of the United States Court of Appeals for the Sixth Circuit using the ECF system, which will send notification of the filing to the following attorney of record:

Richard M. Shulman, rshulman@rshulmanlaw.com

/s/ Jessica Currie
Assistant United States Attorney

# Relevant District Court Documents

The United States of America designates as relevant these documents in the district court's electronic record, Eastern District of Michigan case number 2:18-cr-20351-3:

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 152 | Verdict Form | 833–36 |
| 188 | Jury Trial Tr., 10/28/2019 | 1036–1170 |
| 189 | Jury Trial Tr., 10/29/2019 | 1171–1307 |
| 190 | Jury Trial Tr., 10/30/2019 | 1308–1441 |
| 191 | Jury Trial Tr., 10/31/2019 | 1442–1584 |
| 192 | Jury Trial Tr., 11/01/2019 | 1585–1724 |
| 193 | Jury Trial Tr., 11/04/2019 | 1725–1891 |
| 194 | Jury Trial Tr., 11/05/2019 | 1892–2016 |
| 195 | Jury Trial Tr., 11/06/2019 | 2017–2112 |
| 196 | Jury Trial Tr., 11/07/2019 | 2113–2242 |
| 197 | Jury Trial Tr., 11/08/2019 | 2243–2330 |
| 199 | Jury Trial Tr., 11/12/2019 | 2361–2474 |
| 238 | Government's Sentencing Memorandum | 2636–2660 |
| 243 | Notice of Appeal | 2780 |
| 246 | Sentencing Tr., 05/04/2021 | 2783–2800 |
| 285 | Motion Hearing Tr., 10/22/2019 | 3131–3152 |

| Record No. | Document Description | Page ID Range |
|---|---|---|
| 286 | Notice of Filing and Exhibits | 3153–3164 |
| n/a | Presentence Investigation Report with Addendum | n/a |